# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **LINDA ALLARD,** on behalf of herself and all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>**SCI DIRECT, INC. d/b/a NEPTUNE SOCIETY,**<br><br>　　　　　　　　Defendant. | CIVIL CASE NO: 16-1033<br>JUDGE SHARP<br>MAGISTRATE JUDGE HOLMES |

**Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment**

## INTRODUCTION

Somewhere along the way to becoming one of the largest affordable cremation providers in the country, Defendant, SCI Direct, Inc., discarded dignity and respect for the elderly and/or terminally ill in favor of needlessly high-pressure sales tactics, including unstoppable telephone calls (often made with a prerecorded voice) and accusations that a non-interested lead is potentially abandoning his or her loved ones if he or she does not buy Defendant's services. When a lead directly tells Defendant to stop calling, Defendant often ignores the request and continues to call, providing the lead constant unwanted reminders of their mortality.

These practices do not just violate a sense of common decency, but the Telephone Consumer Protection Act ("TCPA"). The TCPA requires companies to make certain disclosures to persons to whom it will make prerecorded telemarketing calls before making those calls. It also requires companies to implement an internal "do not call" list, in writing, and train its employees on the existence and use of that list, prior to making *any* telemarketing calls. Rarely has there been a case that illuminates just why these requirements are important the way this case does.

Defendant undisputedly failed to provide the mandated disclosures or maintain a written "do not call" list. Yet rather than own its failures, Defendant asks the Court to set aside common sense and the record in this case, and rewrite the TCPA. The Court should do none of the above.

## BACKGROUND

In February 2013, Plaintiff Allard sent in a mailer card to Defendant in order to receive information on its cremation services. (Exhibit A, Response 6.) This mailer card said nothing about the possibility of prerecorded or automated telemarketing calls. (Exhibit B.)[1] Shortly thereafter,

---

[1] According to Defendant, this mailer card is an exemplar using identical language rather than the actual mailer card.

Defendant began placing telemarketing calls to Plaintiff Allard's cellular telephone number. (Exhibit A, Responses 1 and 5.) However, Ms. Allard decided she was no longer interested in Defendant's services and asked Defendant to stop calling. (Exhibit C, Excerpts from Allard Depo., 92:3-93:2.) Defendant continued to call, however, including calls using a prerecorded voice. Accordingly, Ms. Allard called Defendant's corporate office and asked it to stop calling, filed a complaint with the Better Business Bureau asking Defendant to stop calling, and sent Defendant an email asking it to stop. (Exhibit C, Allard Depo., 96:24-97:11; Exhibits D and E) Defendant responded to the Better Business Bureau complaint by apologizing and agreeing to stop the calls. (Exhibit D.) However, approximately one month later, Defendant placed another artificial or prerecorded call to Plaintiff's cellular telephone. (Exhibit A, Response 1; Exhibit D.) Ms. Allard subsequently filed a complaint with the FTC and updated her Better Business Bureau complaint. (Exhibits D and F.)

Upset by Defendant's refusal to stop the calls, and its use of a "robot" to call her about something as sensitive as her final plans, Ms. Allard monitored the internet for other persons affected and looked to see if anyone initiated a class action against Defendant related to its calling practices. (Exhibit C, Allard Depo., 97:16-98:15.) When no one stepped up despite the numerous online complaints, Ms. Allard decided that she would take the initiative. (*Id.* at 99:25-100:10.) Accordingly, Ms. Allard filed the instant putative class action suit.

## LEGAL STANDARD

"Summary judgment is appropriate where the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rocheleau v. Elder Living Constr.*, 814 F.3d 398, 400 (6th Cir. 2016). "The key issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

2

sided that one party must prevail as a matter of law." *Id.* "To show that a fact is, or is not, genuinely disputed, both parties are required to either cite to particular parts of materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Lukic v. Eisai Corp. of N. Am.*, 919 F. Supp. 2d 936, 943 (W.D. Ten. 2013). A court must draw all reasonable inferences in favor of the nonmoving party. *Id.*

## DISCUSSION

There are two provisions of the TCPA at issue in this litigation: sections 227(b) and 227(c). Section 227(b) of the TCPA makes it "unlawful for any person[2] within the United States … to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service …." 47 U.S.C. § 227(b)(1)(A)(iii). To prevail on a § 227(b) claim, a plaintiff must show that the TCPA defendant (1) made calls to his or her cellular telephone (2) using an automatic telephone dialing system or using an artificial or prerecorded voice. *See, e.g.*, *Ayers v. Receivables Performance Mgmt., LLC*, Case No. 15-cv-12082, 2016 U.S. Dist. LEXIS 132875, *15 (E.D. Mich. Sept. 28, 2016). Consent is an affirmative defense rather than part of a plaintiff's affirmative case. *See, e.g.*, *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325 (3d Cir. 2015) ("[P]rior consent to receiving robocalls provides a defense to liability."); 2012 FCC Order, 27 FCC Rcd. 1830, 1844 ¶ 33 (F.C.C. 2012).

The type of consent sufficient under the law depends on nature of the call. Calls made for non-telemarketing purposes require only "prior express consent."47 CFR § 64.1200(a)(1). Prior

---

[2] Defendant is a "person" as "person" is defined to include corporations. 47 U.S.C. § 153(39).

express consent is typically found when a person provides his or her telephone number. *See* 1992 FCC Ruling, 7 FCC Rcd. 8572, 8769 ¶ 31 (F.C.C. 1992).

For calls that include an advertisement, or constitute telemarketing, prior express *written* consent is required. *See* 47 CFR § 64.1200(a)(2). Prior express written consent is specifically defined by statute as:

> [A]n agreement, in writing, bearing the signature of the person called <u>that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice</u>, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 CFR § 64.1200(f)(8) (emphasis added).

A call is an advertisement if it contains "any material advertising the commercial availability or quality of any property, goods, or services." 47 CFR § 64.1200(f)(1). A call is "telemarketing" if it is initiated "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 CFR § 64.1200(f)(11). In other words, while calls that contain advertisements on the call itself plainly require prior express written consent, calls that were made for the *purpose* of encouraging the purchase of goods or services also require prior express written consent, even if the calls themselves do not introduce an advertisement. *See, e.g.*, *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 819 (8th Cir. 2015).

Section 227(c) relevantly prohibits a company from making "any call for telemarketing purposes … unless such a person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 CFR § 64.1200(d). These procedures "***must*** meet" certain standards, including maintaining a "written policy, available upon demand, for maintaining a do-not-call list" and

4

"inform[ing] and train[ing] personnel in the existence and use of the do-not-call list." 47 CFR § 64.1200(d)(1) and (2). Any person who has received more than one telephone call within any 12-month period in violation of these regulations has a cause of action. 47 U.S.C. § 227(c)(5). Unlike with 227(b) calls, the equipment used to make the calls at issue is irrelevant to a 227(c) claim.

This memorandum will first discuss the overlapping elements: that the calls are telemarketing and that Defendant made the calls. This memorandum will then discuss the specific liability-triggering provisions for each section of the statute.

## I. Defendant's Calls Are "Telemarketing" and/or "Advertising" as Defined in the TCPA.

Defendant's argues that because it purportedly did not finalize sales over the phone, its calls were not telemarketing. But the TCPA covers calls that contain an advertisement on the call *or* are made for the purpose of selling a product or service (even at a later date or meeting). The text of the statute, the FCC's regulations, and a unanimity of courts make this clear.

### a. The Law.

Telemarketing is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 CFR § 64.1200(f)(12). The key word in this definition is "purpose." For example, the Eighth Circuit has held in the TCPA context that "[w]hile the content of the calls controlled whether they were 'advertisements,' their purpose controlled whether they were 'telemarketing.'" *Golan v. Veritas Ent., LLC*, 788 F.3d at 820. The Ninth Circuit held similarly: "[n]either the [TCPA] nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Whether a call is telemarketing should be

5

approached "with a measure of common sense." *Id.*

The FCC has also repeatedly reiterated a purpose-based approach to determining whether calls are telemarketing. In 2003, the FCC wrote that calls made to "inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services" would be telemarketing. 2003 FCC TCPA Order, 18 FCC Rcd. 14014, 14098 ¶ 142 (F.C.C. 2003). It further wrote that "[i]f the call is intended to offer property, goods, or services for sale either during the call, or in the future ... that call is an advertisement." *Id.* The FCC held the same in 2012. 2012 FCC TCPA Order, 27 FCC Rcd 1830, 1842 ¶ 30.

Numerous courts have also endorsed this approach. In *Golan*, defendant left a message stating: "Liberty. This is a public survey call. We may call back later." 788 F.3d at 819. Defendant argued that its phone message did not contain an advertisement or qualify as telemarketing. The court agreed that because the message did not mention property, goods, or services, it was not an advertisement. *Id.* However, recognizing the distinction between *advertising* and *telemarketing* in the TCPA, the court wrote "[w]hile the content of the calls controlled whether they were 'advertisements,' their purpose controlled whether they were 'telemarketing.'" *Id.* at 820. It found that the calls, though they did not mention any product or service, were part and parcel of a campaign to promote a movie. *Id.* Accordingly, the calls were telemarketing.

*In Chesbro*, the court found that prerecorded messages from Best Buy informing customers that their "Reward Zone" certificates were about to expire were both informational *and* telemarketing, because the calls urged the recipient to redeem the RewardZone points before they expired and thanked the recipient for shopping at Best Buy. 705 F.3d at 918. The court concluded that "[b]ecause the calls encouraged recipients to engage in future purchasing activity, they ...

6

constituted telemarketing under [47 C.F.R. § 64.1200(f)(12)]." *Id.* at 918.

Defendant's cited cases are inapposite. *Aderhold* involved an individual who signed up to participate in a local car sharing service, and received an immediate text message.[3] *Aderhold v. car2go N.A., LLC*, 2016 U.S. App. LEXIS 16596 (9th Cir. Sept. 9, 2016). The court expressly acknowledged that *purpose*, not content, determines whether a message is telemarketing. *Id.* at *2. The court noted that this question should be approached with common sense. *Id.* at *3. However, the court found that the message at issue was entirely devoid of content encouraging purchase of car2go services, and was a type of message that the FCC had expressly exempted because it was intended "to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into[.]" *Id.* at *3.

In *Daniel*, the plaintiff signed up for a loyalty program called "Five Stars" and within minutes received a text message stating "[w]elcome to Five Stars, the rewards program of Flame Broiler. Reply with your email to finish registering and get free pts! Txt STOP to unsubscribe." *Daniel v. Five Stars Loyalty, Inc.*, Case No. 15-cv-03546, 2015 U.S. Dist. LEXIS 159007, *2-3 (N.D. Cal. Nov. 24, 2015). The court held that "a text sent solely for the purpose of allowing the recipient to complete a registration process that he or she initiated shortly before receiving the text is not telemarketing within the meaning of [the TCPA]." *Id.* at *11.

   b. Defendant's Calls Generally

Common sense does not help Defendant here. Indeed, Defendant's calls go much further than any of the cases cited above, and plainly encourage purchases of its services. Defendant does

---

[3]    The message stated: "Please enter your car2go activation code 14858 into the emailed link. We look forward to welcoming you to car2go." *Aderhold v. car2go N.A., LLC*, Case No. 13-cv-489, 2014 U.S. Dist. LEXIS 26320, *3 (W.D. Wash. Feb. 27, 2014).

not actually argue otherwise in its Motion. Instead, Defendant argues that it cannot, by law, finalize sales over the telephone, so its calls cannot be telemarketing.[4] But while completing a sale on a call might be sufficient to make the call telemarketing, it is not necessary.

The actual *purpose* of Defendant's calls is clear from the record. Defendant's call script, found in Exhibit 1 to the Ramos Declaration, begins by mentioning Defendant's "pre-need cremation program." The script further explains that Defendant's services are "simple" and "economical," that Defendant deals in "simple, dignified, and economical direct cremations," that Defendant is "the largest and oldest simple cremation company in the nation" and does "simple cremations," and offers to stop by the call recipients home to "explain our services" and "leave you with a price" to allow the call recipient "to make a decision."

Defendant's "Challenge System," found in Exhibit 2 to the Ramos Declaration, also show that the calls were telemarketing. For example, if a call recipient tells Defendant that they are not interested,[5] Defendant instructs its sales representatives to say the following:

> I get that. We are human – we change our minds and decide we're not interested anymore. However, you recently sent us a card which means to me you really are interested in gaining peace of mind and protecting your loved ones. Now, you just said you're not interested which tells me you either learned about our plan or possibly changed your mind about protecting your loved ones. You haven't changed your mind on protecting your loved ones, have you? And the only obligation you have is to say "NO" if you don't see the value of our program – you're the type of person who can say no, right? I'm so glad to hear that. Are mornings or afternoons better for you?

If a call recipients asks Defendant to just tell them the price, Defendant instructs its sales

---

[4]     If anything, this makes Plaintiff's position as to the telemarketing purpose of the calls even stronger, because if Defendant was *required* by law to finalize sales in person, the calls to make those appointments were necessary and vital to Defendant making a sale.

[5]     Which raises the question of "not interested in what?" if Defendant's arguments that it was not selling anything are to be believed.

representatives to say:

> Sure, I can tell you the price,[6] however our price is based on the package and payment plan you choose. And, truly, the only way to determine which plan is right for you is to spend just 15-20 minutes with me one-on-one so I can further educate you on the true value of the decision to protect your loved ones. At that time, the price to value comparison is your decision to make. But, honestly, having the opportunity today to lighten your loved ones[sic] burden later is priceless. Wouldn't you say this is something very valuable to you?[]

Setting aside the ethics of instructing employees to prey upon an elderly individual's fear of leaving their loved ones behind, the purpose of such calls was to encourage the purchase of Defendant's services, even if that sale would not be finalized until an in-person meeting.

Indeed, if the telemarketing purpose of the calls was not evident from the context of the calls and the scripts used, one of Defendant's former employees confirms that the calls were telemarketing. Jon Halprin was a Sales Manager for Defendant from approximately January 2, 2013 through June 1, 2015. (Halprin Affidavit, ¶¶ 4-5; Exhibit G, Response 5). Mr. Halprin's duties included managing all aspects of day-to-day operations, sales management, direct sales needs, people management, partnership with the local services team, oversight of the sales team, and making telephone calls. (Halprin Affidavit, ¶¶ 7-8, 19; Exhibit G, Response 5.) In his Affidavit, Mr. Halprin stated that "[a]ll calls made by the sales team to leads had the ultimate goal of making a sale of Neptune Society's services." (Halprin Affidavit, ¶ 30.)

Accordingly, Defendant's calls were made with the purpose of encouraging the purchase of its services, and at minimum, there is a genuine issue of material fact on this issue.

c. Defendant's Calls to Ms. Allard

With respect to the calls specifically to Ms. Allard, the record shows that these were part

---

[6]     Like footnote 5: price of what?

9

of the same telemarketing scheme described above. In Ms. Allard's complaint to the Better Business Bureau, she wrote that "[t]he last phone call I received … as[sic] and automated call telling me I still had time to sign up before prices were raised." Exhibit D. When Ms. Allard supplemented her BBB complaint after the calls did not stop, she wrote "I received yet another automated call today [from Neptune Society of Nashville] trying to sell me their services." *Id.* Ms. Allard also filed a complaint with the FTC, writing relevantly:

> I continued to get marketing calls from Neptune Society and I told them as many as four different times that I no longer needed their service and not to call me again. When[sic] I received yet another automated call on August 6, 2014 trying to sell me a plan…. I thought the matter was closed until I got another automated call today from the Neptune Society trying to sell me a package[.]

Exhibit F.

In Ms. Allard's deposition, she also testified as to the marketing nature of the calls. At the deposition, the following exchange took place:

> Q. Until you got another automated call from the Neptune Society trying to sell you a package from phone number 615-373-6946?
>
> A. That's correct.

(Exhibit C, Allard Depo., 78:1-78:4.)

In addition to Ms. Allard's own characterization of the calls, discovery has revealed the actual transcripts of the prerecorded messages used on two of the calls to Ms. Allard.[7] The August 4, 2014 call stated, in a prerecorded message:

> Hello. This is Kevin from the Neptune Society. Recently, you mailed us a response card requesting information about our cremation preplanning. Sorry we missed you in our first attempt, but you still have time to take advantage of our current plan before the price increase takes effect in late August. Neptune Society works as the

---

[7] Due to a misunderstanding in discovery, these transcripts are different (though immaterially) than those found in Plaintiff's Motion for Class Certification. Plaintiff intends to seek leave to correct the class certification brief at the April scheduling conference.

most responsible arrangement you will make for your loved ones. Please call Kevin at 615-545-5541 for a visit.

(Exhibit H.)

The September 17, 2014 call stated, in a prerecorded message:

> Greetings. This is the Neptune Society. Recently, you met with us to discuss cremation pre-planning. Currently, we are running a special of 0% which will save you money. It's time to take advantage of our current plan before the price increase takes effect in October. Neptune is the most responsible arrangement you will make for you and your loved ones. Call us at 615-373-6946. This offer will expire in a couple of days. Don't hesitate. 615-373-6946.

(Exhibit I.)

These calls, like the others, plainly advertise and promote Defendant's offerings, and are meant to encourage Ms. Allard's purchase of Defendant's services.

Accordingly, all of Defendant's calls, including those to Ms. Allard, were made to encourage the purchase of its cremation services. At minimum, the above presents a genuine issue of material fact and Defendant's Motion for Summary Judgment should be denied.

## II.    Defendant, not CallFire, Initiated the Calls.

The "TCPA makes it unlawful in certain circumstances to 'initiate' a telephone call." *Imhoff Inv., LLC v. Alfoccino, Inc.*, 792 F.3d 627, 635 (6th Cir. 2015). Defendant argues that CallFire, rather than Defendant, initiated the calls for the purposes of TCPA liability.[8] Defendant's argument has been rejected by every court to have considered it, as well as the FCC.

Furthermore, the entirety of Defendant's factual support for its position rests on paragraphs in Ramos' declaration that are improper under Fed. R. Civ. P. 56(c)(4), and therefore

---

[8]    This would only matter for the 227(b) claim and the subset of CallFire calls included in the 227(c) claim. The 227(c) claim would remain live either way for the calls Defendant made without CallFire.

11

cannot be considered.

a. Paragraphs 25 through 27 of the Declaration of Dolores Ramos May Not Be Considered.

"Federal Rule of Civil Procedure 56(c)(4) requires supporting affidavits to be based on personal knowledge, meaning personal observations or experiences." *Alexander v. Kellogg USA, Inc.*, 2017 U.S. App. LEXIS 236, *6 (6th Cir. Jan. 4, 2017). "It is the burden of the party submitting the affidavit to show circumstances indicating the [affiant] has based the statement on personal knowledge." *Id.* at *6-7. A declaration not based on personal knowledge may not be considered. *See id.* at *8.

Here, Ms. Ramos fails to provide any basis for the following assertions in her declaration

**Paragraph 25**: CallFire allows a user to purchase "credits," which can then be used to set up calling campaigns to telephone numbers submitted to Callfire.

**Paragraph 26**: Once the numbers are submitted, CallFire would then initiate calls automatically to the inputted telephone numbers without further intervention from the user.

**Paragraph 27**: The recipient of the CallFire calls would then receive a prerecorded message to call SCI back and set up an appointment.

Nothing in the declaration indicates how Ms. Ramos has personal knowledge of, or would be competent to testify about, the mechanics of CallFire. Indeed, Defendant has maintained throughout this litigation that its employees used CallFire without its knowledge. (Def.'s Memorandum, p. 15.) Ms. Ramos says nothing to indicate that she has any personal experiences with CallFire. She says nothing to indicate that she used CallFire or directly oversaw its use. She says nothing about reviewing CallFire's documentation. She says nothing about testing CallFire. Her speculation on CallFire's inner workings are "upon information and belief," and simply omitting that phrase does not change that "statements based on mere 'information and belief' …

12

are not based on personal knowledge." *Id.* at *7-8.

Accordingly, because Defendant has failed to show that Ms. Ramos has based her statements in paragraphs 25 through 27 of her declaration on personal knowledge, they may not be considered in support of Defendant's Motion for Summary Judgment. Because Ms. Ramos' declaration provides the only "facts" supporting Defendant's argument that CallFire initiated the calls, Defendant's Motion for Summary Judgment on this ground must be denied.

### b. CallFire is a Common Carrier, and Does not Initiate Messages

Not only is Ms. Ramos' declaration improper, it is factually incorrect. "CallFire is a common carrier, and therefore not subject to liability for alleged violations of the Telephone Consumer Protection Act." *Rinky Dink, Inc. v. Elec. Merch. Sys.*, Case No. 13-1347, 2015 U.S. Dist. LEXIS 22108, *2 (W.D. Wash. Feb. 24, 2015). CallFire is even a registered telecommunications carrier with the FCC.[9] The courts that have analyzed CallFire's service has found that CallFire cannot be liable under the TCPA because it does not initiate the messages.

For example, in *Rinky Dink*, the court wrote that "[t]he TCPA was intended to apply to the persons initiating the telephone call or sending the message and … not to the common carrier … that transmits the call or messages and that is not the originator or controller of the content of the call or message." 2015 U.S. Dist. LEXIS at *12. The court then found CallFire to be a common carrier because it offered indiscriminate service to the public, did not control the content or timing of the messages, did not control the recipient list, and was not highly involved with the TCPA violations at issue. *Id.* at *14-19. The court also concluded that CallFire did not "initiate" the messages but instead transmits data only after the process is initiated by its customers. *Id.* at 24.

---

[9]     FCC Form 499 Filer Database, http://apps.fcc.gov/cgb/form499/ 499detail.cfm?FilerNum=829923

In *Luna v. Shac*, the court provided an overview of how CallFire works, stating that CallFire subscribers "transfer[] … the telephone number into the CallFire database, draft[] the message, determin[e] the timing of the message, and click[] 'send' on the website to transmit the message[.]" 122 F. Supp. 3d 936, 940. In *Kauffman v. CallFire, Inc.*, the court found that "Defendant CallFire's degree of involvement in sending text messages to Plaintiff was even smaller" than the platforms that the FCC ruled could not be liable in the *TCPA Declaratory Ruling*.[10] 141 F. Supp. 3d 1044, 1048 (S.D. Cal. 2015).

Nothing has changed, and even a cursory review of the documentation CallFire provides on its website, as well as screenshots the CallFire process, shows Ms. Ramos' declaration to be fiction. The publicly available documentation for voice broadcast campaigns describe the process as follows:

> 1. Select Your Sounds – Create recordings for various scenarios related to your outgoing calls, including those answered by a live person or answering machine….
>
> 2. Add Your Contacts – Upload a list of people you'll reach from your computer, or paste it in from a text source. If you've conducted campaigns before, you can choose a list you've already used or filter from previous calls or texts.
>
> 3. Finalize Your Settings – Name your campaign, designate the phone number that people will see when you call, and set the maximum number of calls that our system will make simultaneously. Other options include automatic redialing, time restrictions and creation of schedules.

https://www.callfire.com/help/docs/voice-broadcast

The documentation provides additional details on finalizing settings, including:

> 3. **Restrictions:** This box offers you several important options …

---

[10] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd. 7961 (Jul. 10, 2015) ("TCPA Declaratory Ruling.") Therein, the FCC found that a provider cannot be liable when "it does not control the recipients, timing, or content" of the messages sent by the provider's users. *Id.* at 7982, ¶ 33.

14

- o **Local Time Dialing Restrictions**: Click the box, then select the hours during which you want calls made from the pulldown menus.

- o **Automatic Retry**: Decide whether or not you want the system to retry numbers it didn't reach the first time. Designate the number of retries, the length between them, and which features you want to enable.

- o **Max Simultaneous Calls**: Enter the maximum number of calls that you want CallFire's powerful system to simultaneously dial for you.

4. **Schedule**: If you want your campaign to begin right away, select the Start Immediately box. Otherwise, click on the Add Schedule button and complete the settings in the Create Schedule pop-up box. After you click the green Create Schedule button, you'll be returned to the Settings tab, and you'll see your schedule in the Schedule section.

https://www.callfire.com/help/docs/voice-broadcast/finalizing-settings

A 2014 declaration from Jagannathan Thinakaran, CallFire's Chief Operating Officer, further describes how CallFire works. In this declaration, Mr. Thinakaran stated that

> CallFire offers various web-based common carrier services that allow CallFire's customers to create their own voice or text messages and transmit those messages to recipients selected by the user through CallFire's web-based common carrier services.
>
> Callfire does not provide its customers with lists of telephone numbers or the content of the messages they choose to send. Rather, all CallFire customers that utilize CallFire's common carrier services to initiate their own messages provide their own content, select their own list of telephone numbers to be contacted, and select when their messages will be initiated.

(Exhibit J, Thinakaran Decl., ¶¶ 3-4.)

Finally, attached to this opposition is a sample work flow for creating a voice broadcast which shows clearly that it is the user that creates the message, uploads the contacts, and initiates the call campaign (by either clicking "start immediately" or adding a schedule). (Exhibit K.)

In other words, CallFire subscribers supply the content of their voice broadcasts, personally input and select the telephone numbers to which they wish to transmit their message, select the time they wish to send their message, and then click a button to start the campaign. At minimum,

15

there is a genuine dispute of material fact about who initiated the calls.

### c. Defendant Encouraged Its Employees to Use CallFire.

Defendant acts as if it was caught off guard by its employees' use of CallFire, but the record reveals otherwise. In Mr. Halprin's affidavit, he states that he learned about CallFire on a conference call held by Defendant's regional manager, Silvia Marchini. (Halprin Aff., ¶¶ 51-54.) On this call, Ms. Marchini, and a Sales Manager in Orlando, Geno Perez, described the use and value of CallFire, and asked that the managers consider using it. (*Id.* at ¶¶ 54-55.) Mr. Halprin also received reimbursements for the money spent on CallFire. (*Id.* at ¶ 59.) Mr. Halprin further stated that he raised concerns about using CallFire to Ms. Marchini, but Ms. Marchini instructed him to continue using it. (*Id.* at ¶ 60.) Finally, Mr. Halprin stated that no one ever asked him to stop using CallFire, nor was CallFire against any company policy. (*Id.* at ¶ 57.)

Mr. Halpin's statements are supported by written discovery. In response to Plaintiff's subpoena to CallFire, CallFire produced a list of nine different accounts on CallFire using an @neptunesociety.com domain name, including the aforementioned Eugenio Perez. (Exhibit L.) Defendant has also admitted that it never instructed Mr. Halprin to stop using CallFire or reprimanded him for his use of CallFire, nor did it ever instruct its employees that they could not use third-party calling or dialing services, or prerecorded voices in their calls. (Exhibit M, Responses 9-12)

### III. Defendant Was Required to Obtain "Prior Express Written Consent" Prior to Making its Calls Using a Prerecorded and/or Artificial Voice.

### a. The Required Disclosures

Because the prerecorded calls to Plaintiff were telemarketing, prior express *written* consent

16

was required before Defendant could legally make its prerecorded calls.[11] *See* 47 CFR § 64.1200(a)(2). Defendant did not have such consent.

The FCC enacted the prior express written consent requirement in 2012, with an effective date of October 16, 2013. *See* 2012 FCC Ruling, 27 FCC Rcd. 1830, 1857 (F.C.C. 2012). In this ruling, the FCC wrote:

> We conclude that requiring prior express written consent for telemarketing calls utilizing autodialed or prerecorded technologies will further reduce the opportunities for telemarketers to place unwanted or unexpected calls to consumers. We believe that requiring prior written consent will better protect consumer privacy because <u>such consent requires conspicuous action by the consumer -- providing permission in writing -- to authorize autodialed or prerecorded telemarketing calls</u>, and will reduce the chance of consumer confusion in responding orally to a telemarketer's consent request.

*Id.* at 1839, ¶ 24 (emphasis added).

As enacted, prior express written consent is defined as:

> [A]n agreement, in writing, bearing the signature of the person called <u>that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice</u>, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 CFR § 64.1200(f)(8) (emphasis added).

This agreement must include a "clear and conspicuous" disclosure informing the signatory that:

> By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice[.]

47 CFR § 64.1200(f)(8)(i)(A) (emphasis added).

---

[11]     Because prior express *written* consent is required, all of Defendant's arguments that merely providing a phone number is sufficient consent are inapplicable, as such arguments are only applicable to "prior express consent," which is the requirement for *non*-telemarketing calls.

17

In addition to the FCC's own interpretations and regulations, courts have emphasized the requirement that the disclosure explicitly state that the calls may be autodialed. For example, in late 2015, the Sixth Circuit contrasted "prior express consent" and "prior express written consent," writing that "[t]he FCC's regulations for telemarketers now require a more specific type of consent – namely, that the called party consents, in writing, to being called *by an auto-dialer*." *Hill v. Homeward Residential*, 799 F.3d 544, 552 (6th Cir. 2015) (emphasis in original).

Similarly, in the Central District of California, on a strikingly similar set of facts, the court denied a TCPA defendant's Motion to Dismiss and Motion for Summary Judgment, writing that "[a]lthough plaintiff provided his personal information on Defendant's website submission page, he did not give clear written consent to receiving messages using an automatic telephone dialing system or an artificial or prerecorded voice as required[.]" *Perri v. Rescue 1 Fin., LLC*, Case No. CV-15-00287, 2015 U.S. Dist. LEXIS 95717, *1-2 (C.D. Cal. July 22, 2015). The court then emphasized the requirement that the agreement disclose that the calls would be made using an automatic telephone dialing system. *Id.* at *2 ("The term prior express written consent means an agreement, in writing … that *clearly* authorizes the seller to deliver or cause to be delivered to the person called … telemarketing messages *using an automatic telephone dialing system or an artificial or prerecorded voice*….") (emphasis in original).

The District Court for the District of Minnesota contrasted the telemarketing-call consent requirements prior to October 16, 2013 (prior express consent) with the requirements after (prior express written consent), and emphasized that prior express written consent requires a disclosure that the calls will be made using an automatic telephone dialing system. *See Soular v. Northern Tier Energy LP*, Case No. 15-cv-556, 2015 U.S. Dist. LEXIS 112294, *16-17 (D. Minn. Aug. 25, 2015).

18

Finally, in the Western District of Washington, the court wrote that defendant failed to comply with the requirements of written consent because defendant "continued to text [plaintiff] after October 16, 2013 [the effective date of the FCC's prior express written consent regulations] without disclosing that it was using an autodialing system to do so". *Lennartson v. Papa Murphy's Holdings, Inc.*, Case No. C15-5307, 2016 U.S. Dist. LEXIS 725, *7 (W.D. Wash. Jan. 5, 2016).

Thus, in order for a signed agreement to qualify as "prior express written consent" for telemarketing calls, the agreement must 1) be signed by the called party, 2) authorize the seller to deliver advertisements or telemarketing messages 3) disclose the possible use of an automatic telephone dialing system or an artificial or prerecorded voice and 4) contain the telephone number to which the signatory is giving the seller permission to deliver its messages. It is the third element that is at issue in this case.

### b. Defendant's Materials Failed to Disclose That the Calls Would Be Made Using a Prerecorded Voice.

Defendant obtained Plaintiff Allard's information on a mailer card Ms. Allard sent to SCI. (Exhibit A, Response 6). As seen in Exhibit B, there are no disclosures whatsoever regarding the use of an autodialer or prerecorded voice. Defendant also admitted in discovery that not only did the mailer card through which Ms. Allard provided her information lack the required disclosures, none of its materials through which it solicited phone numbers contained the required disclosures. (Exhibit N, Response 3.)

Accordingly, because Defendant's materials failed to disclosure the possibility of calls using an autodialer or prerecorded voice, Defendant did not obtain "prior express written consent" from Ms. Allard or anyone else, and any telemarketing calls made using an autodialer or prerecorded voice were made in violation of the TCPA.

19

c. <u>The Lack of a Disclosure Actually Matters.</u>

Though somewhat tangential, it is worth discussing why this lack of a disclosure actually

matters. In Ms. Allard's own words:

> Q. So what, specifically, about having an automated voice would be upsetting to you about that?
>
> A. Because it's a sensitive subject. I don't much like to talk to robots when I'm calling in for customer service on my cable, but I do that. But this is a more personal subject, and I don't really want it to be handled through an automated system.

(Allard Dep. 48:1-14.)

> Q. Specifically, how have you been harmed by receiving a telephone call that had a prerecorded voice?
>
> A. Well, as I say, I was offended by having such a personal issue being handled like something you would buy off the Internet or something you'd buy off TV or something. I was just kind of blindsided by having it go that route because, as I say, I've known the company for a long time. I thought they were professionals.
>
> I lost my mother when I was around 30 years old, and the funeral home that handled that was so kind and helpful and took such good care of her and us that I kind of expected the same kind of thing to come from Neptune Society. And when they behaved in the way they did and started calling me with a robot, I was deeply offended and upset and worried that I had almost put my niece into the hands – to leave her in a difficult situation in the hands of people who would behave like this.

(Exhibit C, Allard Dep., 105:6-106:1.)

## IV. Defendant Failed to Keep a Written "Do Not Call" Policy or Train Its Employees on its Internal "Do Not Call" List Prior to Making Telemarketing Calls.

### a. <u>The TCPA Protects the Capacity of a Person to Stop Telemarketing Calls.</u>

Defendant makes the somewhat strange argument that a provision of the TCPA is "directly

contrary to the entire purpose of the TCPA." Even if this were true, it is of no matter. If Defendant

wants the law changed, it should petition Congress.

Of course, it is not true that the written "do not call" policy requirement is against the

20

purpose of the TCPA. The requirement was put into place in what was literally the TCPA's enacting regulation. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd 8752, 8753 (Oct. 16, 1992) ("TCPA Implementation Order") ("This proceeding was initiated by passage of the Telephone Consumer Protection Act of 1991[.]"). Specifically, the TCPA required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The FCC was explicitly instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems … )" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." *Id.* at (c)(1)(A) and (E). Thus, not only is the FCC's action in requiring company specific do-not-call lists to meet certain criteria *not* against the purpose of the TCPA, but the FCC was expressly mandated to consider such an option.

The FCC, pursuant to its statutory authorization, found that company specific do-not-call lists were a good idea, and that requiring maintenance of a written policy and training was part ensuring that those lists are effective. It specifically found that "the company-specific-do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *TCPA Implementation Order* at 8765, ¶ 23. It further wrote that "we must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. The FCC recognized that protecting the right to opt out was as much about proactive standards rather than retroactive review, and accordingly placed the burden on Defendant and

chose objective standards for compliance and evaluating compliance.

      b.  <u>Why it Matters.</u>

The case at the bar is the perfect example of why compliance with the requirements are important. Ms. Allard informed Defendant's sales representatives on multiple occasions that she was no longer interested in their products. (Allard Dep., 73:4-15.) She also called Defendant directly and asked it to stop calling, sent it an email asking it to stop calling, and filed a complaint with the Better Business Bureau and FTC asking it to stop calling. (Exhibit C, Allard Depo., 96:24-97:11; Exhibits D, E, and F) The calls did not stop until after the FTC complaint was filed.

But more important is that Ms. Allard's situation is not an aberration. The internet is full of complaints about Defendant's calling practices. For example, there are numerous complaints about Defendant's calling practices on the Better Business Bureau's website.[12] A March 14, 2016 complaint states[13] that "[e]ven tho I told them I told them approx. 15 years ago that I had made other plans they continue to harass me-phoning and not answering or hanging up." A March 1, 2016 complaint asks Neptune Society to "stop telephoning us daily. We are seniors and do not need this aggravation sick and tired of constant phone calls here in Naples Florida. Have repeatedly told them not to call and they persist on calling daily."[14] An October 2015 complaint writes "[u]nwanted solicitation calls – frequent calls after I've told them to stop calling[.]" A February 27, 2015 complaint states "[d]espite numerous emails and phone complaints they won't stop calling me and trying to sell me cremation services …." A February 10, 2015 complaint states

---

[12]     https://www.bbb.org/south-east-florida/business-reviews/cremation-services/neptune-society-in-plantation-fl-7622/reviews-and-complaints

[13]     All such complaints in this paragraph are transcribed without correction.

[14]     The Naples branch is one Mr. Halprin stated he believed to be using Callfire. (Exhibit K, Halprin Affidavit ¶ 61.)

"They won't stop calling my phone number. When they do call, they never leave a message and when I do speak to them and ask that they stop calling, they either hang up on me or agree to stop calling, but continue to do so." An August 2014 complaint states that "Neptune Society continues to contact me by phone and I continue to tell them not to contact me again. The last phone call I received … was an automated call telling me I still had time to sign up before prices were raised."

There is similarly at least one Yelp review of Neptune Society in Sherman Oaks, California in which a "Chris D." writes that "Neptune Society spam calls the elderly. They have called our house repeatedly, despite being told to stop."[15]

The website 800notes.com has catalogued dozens of similar complaints. For one telephone number, 800notes.com lists 10 complaints in the class period, all repeating some variation of Neptune Society calling repeatedly.[16] For another number, there are approximately two dozen complaints within the Class period, including one stating "[d]amn Neptune society calls me several times a week, every week. They've done this for the last three years."[17]

Furthermore, discovery to date indicates that Defendant not only disregarded countless "do not call" requests, but actively encouraged its employees to disregard those requests. For example, when someone tells Defendant's employees they are "not interested," Defendant trains its employees not to stop calling them, but to say:

> [Y]ou just said you're not interested which tells me you either learned about our plan or possibly changed your mind about protecting your loved ones. You haven't changed your mind on protecting your loved ones, have you?

(Ramos Declaration, Exhibit 2.) However, nothing in Defendant's material explains the precise

---

[15]     https://www.yelp.com/biz/neptune-society-sherman-oaks-3?q=spam
[16]     http://800notes.com/Phone.aspx/1-520-226-3005
[17]     http://800notes.com/Phone.aspx/1-954-666-3138

23

circumstances or limitations on when to use this rebuttal other than if a lead is "not interested." Would a statement "I am not interested, please do not call me again" be met with this rebuttal? What about "please don't call me again"? Both seem possible, especially when the calls are made by inadequately trained representatives working on commission, which incentivizes employees to choose the interpretation that leaves open the possibility of making a sale. (Halprin Aff., ¶ 9.)

Mr. Halprin also stated in his affidavit that, while calls could be dispositioned as "do not call," he occasionally received lists of leads to call on something called a "Spice List," which did not contain previous call dispositions (such as "do not call"). Often, persons on the Spice List claimed to have previously asked Defendant not to call. (Halprin Aff., ¶¶ 39-44.)

Simply put, the law requires Defendant to implement certain minimum procedures and it failed to do so. This led not only to *actual* failures to honor "do not call" requests, but deprived everyone called of any meaningful right or ability to stop the calls. This is precisely what the TCPA and the FCC's implementing regulations sought to prevent.

c. Defendant Did Not Maintain a Written "Do Not Call" Policy.

Section 227 requires any entity making calls for telemarketing purposes to have a "written policy, available upon demand, for maintaining a do-not-call list." 47 CFR § 64.1200(d)(1). Defendant has admitted in discovery that during the relevant time periods, it did not maintain a written "do not call" policy. (Exhibit N, Response 4; Exhibit O, ¶ 42.) It does not matter whether Plaintiff ever requested the written policy prior to this litigation, because the fact of its non-existence means that there was no written policy at all, let alone one available upon demand. Accordingly, Defendant's Motion for Summary Judgment should be denied.

d. Defendant Did Not Train its Employees on its Internal "Do Not Call" list.

Defendant has disputed Plaintiff's allegations that it did not train its employees on the

24

existence and use of its internal "do not call" list. However, in support, Defendant relies exclusively on the declaration of Dolores Ramos, who *never actually says* Defendant trains its employees on the existence and use of the internal "do not call" list. Instead, Ms. Ramos says that Defendant's sales managers are taught how to disposition calls using a given list, and that on this list are options to disposition a call as "DO NOT CONTACT" and "DO NOT CALL – DO NOT MAIL." (Ramos Decl., ¶ 21-23.) But training employees on the mechanics of dispositioning a call in the lead management program is not the same as training those employees specifically on the existence and use of Defendant's internal do not call list, if any.

Instead, the record suggests that Defendant did not train its employees on the existence and use of the list. Plaintiff asked multiple times in discovery for documents evidencing any training Defendant provided to its employees on the "do not call" list, and received only one email – sent after this lawsuit was filed – referencing requests to stop contacting persons via physical mail. (Exhibit P, Supplemental Response No. 11; Exhibit Q, Response 3; Exhibit R SCI000184.) If Defendant has no material for training employees on its internal do not call list, it is difficult to see how Defendant could have trained its employees on such a list in any meaningful way.

In addition, Jon Halprin stated that while "[s]ales team members had the power to disposition a call as 'do not call' … SCI/Neptune Society corporate provided neither myself nor the sales team with any formal training on dispositioning calls in such a way, nor did it provide training on any general do-not-call list or policy." (Halprin Aff., ¶¶ 34-35.)

At minimum, there is a genuine dispute of material fact over whether Defendant trained its employees on the existence and use of its internal "do not call" list.

## CONCLUSION

Defendant's Motion for Summary Judgment should be denied in its entirety.

Dated: February 28, 2017

/s/ Jeremy M. Glapion
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

T. Blaine Dixon
**KENNEDY LAW FIRM, PLLC**
127 South Third Street
Clarksville, Tennessee 37040
Tel: 931-645-9900
Fax: 931-920-3300
bdixon@klflaw.ne